**[ORAL ARGUMENT SCHEDULED FOR FEBRUARY 28, 2024]**

Nos. 23-7031, 23-7032, 23-7038

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

NEXTERA ENERGY GLOBAL HOLDINGS B.V., *et al.*,

Petitioners-Appellees,

v.

KINGDOM OF SPAIN,

Respondent-Appellant.

9REN HOLDING S.A.R.L.,

Plaintiff-Appellee,

v.

KINGDOM OF SPAIN,

Defendant-Appellant.

BLASKET RENEWABLE INVESTMENTS, LLC,

Petitioner-Appellant,

v.

KINGDOM OF SPAIN,

Respondent-Appellee.

On Appeal from the United States District Court
for the District of Columbia

### BRIEF FOR THE UNITED STATES AS AMICUS CURIAE

RICHARD C. VISEK
*Principal Deputy Legal Adviser*

*U.S. Department of State*

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

SHARON SWINGLE
THOMAS PULHAM
*Attorneys, Appellate Staff*
*Civil Division, Room 7323*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-4332*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

## A.    Parties and Amici

All parties and amici before the district court and all parties in this Court are listed in the briefs of the parties.  Amicus briefs have been filed in this Court by the Government of the Kingdom of the Netherlands, the European Commission, the Chamber of Commerce of the United States, Blasket Renewable Investments LLC, MOL Hungarian Oil and Gas PLC, various international scholars (Crina Baltag, Diane Desierto, Richard Happ, Charles Kotuby, Veronika Korom, Nikos Lavranos, Ben Love, Loukas Mistelis, Christoph Schreuer, Frederic Sourgen, Christian Tietje, and Claus von Wobeser), and the Republic of Croatia.

## B.    Rulings Under Review

The rulings under review are identified in the parties' briefs.

## C.    Related Cases

The parties' briefs identify several related cases.  Counsel for the United States is not aware of any others.

/s/ *Thomas Pulham*
Thomas Pulham

## TABLE OF CONTENTS

**Page**

GLOSSARY

INTEREST OF AMICUS CURIAE.................................................................. 1

STATEMENT OF THE CASE ....................................................................... 2

    A.    Statutory and Treaty Background.........................................................2

    B.    Factual Background and Prior Proceedings ...................................6

ARGUMENT ............................................................................................... 8

I.    A Federal Court Must Determine that an Arbitration Agreement Exists Before Exercising Jurisdiction Under the Arbitration Exception to the FSIA................................................................................ 8

II.    A Foreign State Does Not Waive Sovereign Immunity Merely by Becoming a Party to the ICSID Convention or New York Convention.....................................................................................19

III.    No Injunction Against Spain Is Justified Here .....................................25

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                                          **Page(s)**

*Al-Qarqani v. Saudi Arabian Oil Co.*,
  19 F.4th 794 (5th Cir. 2021) ............................................................. 13

*Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*,
  10 F.3d 425 (7th Cir. 1993) ............................................................. 28

*Argentine Republic v. Amerada Hess Shipping Corp.*,
  488 U.S. 428 (1989) ....................................................................... 8

*BAE Sys. Tech. Sol. & Servs., Inc. v. Republic of Korea's Def.
  Acquisition Program*,
  884 F.3d 463 (4th Cir. 2018) ......................................................... 26

*Belize Soc. Dev. Ltd. v. Government of Belize*,
  794 F.3d 99 (D.C. Cir. 2015) ................................................... 10, 11

*BG Grp. PLC v. Republic of Argentina*,
  572 U.S. 25 (2014) ....................................................................... 15

*Blue Ridge Invs., L.L.C. v. Republic of Argentina*,
  735 F.3d 72 (2d Cir. 2013) ............................................................. 21

*Broidy Capital Mgmt. LLC v. Muzin*,
  61 F.4th 984 (D.C. Cir. 2023) ........................................................ 19

*Buckeye Check Cashing, Inc. v. Cardegna*,
  546 U.S. 440 (2006) ...................................................................... 17

*Caremark, LLC v. Chickasaw Nation*,
  43 F.4th 1021 (9th Cir. 2022) ........................................................ 16

*Chevron Corp. v. Republic of Ecuador*,
  795 F.3d 200 (D.C. Cir. 2015) ............................ 9, 11, 12, 13, 17

*Creighton Ltd. v. Government of State of Qatar*,
  181 F.3d 118 (D.C. Cir. 1999) ........................................................ 21

*Dist. No. 1, Pac. Coast Dist., Marine Eng'rs' Beneficial Ass'n
  v. Liberty Mar. Corp.*,
  998 F.3d 449 (D.C. Cir. 2021) ........................................................ 16

*E. & J. Gallo Winery v. Andina Licores S.A.*,
    446 F.3d 984 (9th Cir. 2006) ............................................................... 27

*Fourco Glass Co. v. Transmirra Prods. Corp.*,
    353 U.S. 222 (1957) ............................................................................. 24

*Granite Rock Co. v. International Bhd. of Teamsters*,
    561 U.S. 287 (2010) ....................................................................... 15, 16

*Henderson ex rel. Henderson v. Shinseki*,
    562 U.S. 428 (2011) ....................................................................... 14, 15

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
    139 S. Ct. 524 (2019) ........................................................................... 16

*K.F.C. v. Snap Inc.*,
    29 F.4th 835 (7th Cir. 2022) ............................................................... 17

*Kaepa, Inc. v. Achilles Corp.*,
    76 F.3d 624 (5th Cir. 1996) ................................................................ 27

*Khochinsky v. Republic of Poland*,
    1 F.4th 1 (D.C. Cir. 2021) ............................................................. 19, 20

*Laker Airways Ltd. v. Sabena, Belgian World Airlines*,
    731 F.2d 909 (D.C. Cir. 1984) ......................................... 26, 27, 28, 29

*LLC SPC Stileks v. Republic of Moldova*,
    985 F.3d 871 (D.C. Cir. 2021) ........................................................ 9, 14

*Micula v. Government of Romania*:
    404 F. Supp. 3d 265 (D.D.C. 2019) ............................................. 12, 18
    805 F. App'x 1 (D.C. Cir. 2020) .................................................. 12, 13

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
    473 U.S. 614 (1985) ............................................................................... 3

*Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*,
    863 F.3d 96 (2d Cir. 2017) ..................................................... 17, 18, 21

*Persinger v. Islamic Republic of Iran*,
    729 F.2d 835 (D.C. Cir. 1984) ............................................................ 30

*Princz v. Federal Republic of Germany*,
    26 F.3d 1166 (D.C. Cir. 1994) ............................................................. 20

*Process & Indus. Devs. Ltd. v. Federal Republic of Nigeria*,
    27 F.4th 771 (D.C. Cir. 2022) ....................................................... 21, 24

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012) ......................................................................... 22

*Republic of Mexico v. Hoffman*,
    324 U.S. 30 (1945) ........................................................................... 30

*Saudi Arabia v. Nelson*,
    507 U.S. 349 (1993) ...................................................................... 9, 10

*Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co.*
    *v. Navimpex Centrala Navala*,
    989 F.2d 572 (2d Cir. 1993) ............................................................. 21

*Solvay Pharm., Inc. v. Duramed Pharm., Inc.*,
    442 F.3d 471 (6th Cir. 2006) ........................................................... 13

*Tatneft v. Ukraine*,
    771 F. App'x 9 (D.C. Cir. 2019) ...................................................... 21

*The Antelope*,
    23 U.S. (10 Wheat.) 66 (1825) ........................................................ 26

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001) ........................................................................... 24

*Valores Mundiales, S.L. v. Bolivarian Republic of Venezuela*,
    87 F.4th 510 (D.C. Cir. 2023) ........................................................... 5

*Verlinden B.V. v. Central Bank of Nigeria*,
    461 U.S. 480 (1983) ................................................................ 9, 10, 18

*Volt Info. Scis., Inc. v Board of Trs. of Leland Stanford Junior Univ.*,
    489 U.S. 468 (1989) ......................................................................... 15

*Wye Oak Tech., Inc. v. Republic of Iraq*,
    24 F.4th 686 (D.C. Cir. 2022) ......................................................... 14

iv

**Treaties:**

Convention on the Recognition and Enforcement of
    Arbitral Awards, https://perma.cc/NZ69-JV2T ............5
      Art. III ............6
      Art. V(1)(a) ............17

Convention on the Settlement of Investment Disputes
    Between States and Nationals of Other States,
    https://perma.cc/79CR-PJFE ............ 4
      Art. 25(1) ............20
      Art. 53(1) ............17
      Art. 54(1) ............5, 17
      Pmbl. ............20

Energy Charter Treaty,
    https://perma.cc/7YF9-UX3G ............ 4
      Art. 2 ............4
      Art. 26(3)-(4) ............4
      Art. 26(4) ............4
      Art. 26(5)(b) ............5

**Statutes:**

Act of Nov. 16, 1988,
    Pub. L. No. 100-669, sec. 2, 102 Stat. 3969, 3969 ............3

Federal Arbitration Act, ch. 2,
    9 U.S.C. §§ 201-208 ............ 6

Foreign Sovereign Immunities Act of 1976 (FSIA),
    Pub. L. No. 94-583, sec. 4(a), § 1605(a)(1), 90 Stat. 2891, 2892-93 ............2
      28 U.S.C. § 1604 ............ 2
      28 U.S.C. § 1605(a)(1) ............ 1, 2, 19
      28 U.S.C. § 1605(a)(6) ............ 1, 3, 9, 23
      28 U.S.C. § 1605(a)(6)(A)-(C) ............ 22
      28 U.S.C. § 1605(a)(6)(D) ............ 23

22 U.S.C. § 1650a ............ 5

22 U.S.C. § 1650a(a) ........................................................ 5, 18

28 U.S.C. § 1330(a) ........................................................... 2

Foreign State Immunities Act 87 of 1981 § 14 (S. Afr.) ....................................30

State Immunity Act, R.S.C. 1985, c S-18 § 11 (Can.)..........................................30

State Immunity Act, c. 313 § 15(2)-(4) (2014 Rev. Ed.) (Sing.) ........................30

State Immunity Act 1978, c. 33, § 13(2)-(4) (Gr. Brit.).......................................30

**Legislative Materials:**

*Foreign Sovereign Immunities Act: Hearing on H.R. 1149,*
    *H.R. 1689, and H.R. 1888 Before the Subcomm. on*
    *Administrative Law and Governmental Relations of the*
    *H. Comm. on the Judiciary,* 100th Cong. (1987) ............................................ 3

H.R. Rep. No. 94-1487 (1976) ........................................................10, 27

**Other Authorities:**

1 Gary B. Born, *International Commercial Arbitration*
    (3d ed. 2021)..........................................................................15

Dep't of Justice, *Office of Foreign Litigation,*
    https://go.usa.gov/xtB5C (last updated Mar. 22, 2023) ................................ 24

Hazel Fox, *International Law and Restraints on the*
    *Exercise of Jurisdiction by National Courts of States,*
    in *International Law* (Malcolm D. Evans ed., 2003)....................................30

Int'l Energy Charter, *Contracting Parties and Signatories of*
    *the Energy Charter Treaty,* https://perma.cc/XA3F-L2R2 ...........................4

*Otherwise,* Black's Law Dictionary (11th ed. 2019)...........................................23

Restatement (Fourth) of the Foreign Relations Law of the
    United States (Am. Law Inst. 2018) .............................................................. 25

## GLOSSARY

| | |
|---|---|
| ECT | Energy Charter Treaty |
| EU | European Union |
| FSIA | Foreign Sovereign Immunities Act |
| ICSID | International Centre for Settlement of Investment Disputes |
| ICSID  Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States |
| New York Convention | Convention on the Recognition and Enforcement of Arbitral Awards |
| UNCITRAL | United Nations Commission on International Trade Law |

## INTEREST OF AMICUS CURIAE

The United States submits this amicus brief at the invitation of the Court.  The United States has an interest in ensuring that courts correctly interpret the Foreign Sovereign Immunities Act (FSIA), as domestic application of that statute can have significant implications for the treatment of the United States in foreign courts and for our relations with foreign states.  The United States also has an interest in encouraging the reliable and efficient enforcement of international arbitral awards in aid of international commerce, while giving proper consideration to the judicial proceedings and judgments of other nations.

Consistent with the Court's orders inviting its participation, the United States offers its views on three issues.  First, before a United States court exercises jurisdiction over a foreign state under the FSIA's arbitration exception, 28 U.S.C. § 1605(a)(6), the court must determine for itself whether an arbitration agreement exists.  Second, a sovereign state does not waive sovereign immunity under the FSIA's waiver exception, *id.* § 1605(a)(1), simply by becoming a party to a treaty or other international agreement calling for the recognition and enforcement of arbitral awards.  And third, the injunctions in *NextEra* and *9REN* prohibiting Spain from seeking relief

in the courts of another European Union (EU) member country, against
citizens of that country and pursuant to the laws applicable in that country,
were improper.

## STATEMENT OF THE CASE

### A.    Statutory and Treaty Background

**1.** The FSIA is the sole basis for exercising civil jurisdiction over a
foreign state in U.S. courts.  A foreign state is immune from the civil
jurisdiction of a district court unless one of the Act's exceptions applies.
28 U.S.C. §§ 1330(a), 1604.  Two exceptions are at issue here: the waiver
exception and the arbitration exception.

The waiver exception applies in any case "in which the foreign state
has waived its immunity either explicitly or by implication."  28 U.S.C.
§ 1605(a)(1).  It has been part of the FSIA since the law's enactment in 1976.
Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583, sec. 4(a),
§ 1605(a)(1), 90 Stat. 2891, 2892-93.

The arbitration exception applies in any case brought "to enforce an
agreement made by the foreign state with or for the benefit of a private
party" to arbitrate "all or any differences which have arisen or which may
arise between the parties with respect to a defined legal relationship,

whether contractual or not, concerning a subject matter capable of

settlement by arbitration under the laws of the United States," or "to

confirm an award made pursuant to such an agreement to arbitrate," if

> (A) the arbitration takes place or is intended to take place in the United States,
>
> (B) the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards,
>
> (C) the underlying claim, save for the agreement to arbitrate, could have been brought in a United States court under this section or section 1607, or
>
> (D) paragraph (1) of this subsection is otherwise applicable.

28 U.S.C. § 1605(a)(6) (line breaks added).  Congress enacted the arbitration

exception in 1988 to ensure that international arbitral awards would be

enforced in United States courts.  Act of Nov. 16, 1988, Pub. L. No. 100-669,

sec. 2, 102 Stat. 3969, 3969; *see Foreign Sovereign Immunities Act: Hearing*

*on H.R. 1149, H.R. 1689, and H.R. 1888 Before the Subcomm. on*

*Administrative Law and Governmental Relations of the H. Comm. on the*

*Judiciary*, 100th Cong. 3 (1987) (statement of Rep. Fish).  It reflects the

strong federal policy in favor of the efficacy of arbitration for the resolution

of certain international disputes.  *See Mitsubishi Motors Corp. v. Soler*

*Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985).

3

2.  The Energy Charter Treaty, https://perma.cc/7YF9-UX3G (ECT) is "a multinational agreement designed to create 'a legal framework in order to promote long-term cooperation in the energy field.'"  *NextEra* JA804 (quoting ECT art. 2).  The United States is not a party to the ECT, but most members of the EU (including Luxembourg, Spain, and the Netherlands), the EU itself, and a number of other European and Asian countries are parties.  *See* Int'l Energy Charter, *Contracting Parties and Signatories of the Energy Charter Treaty*, https://perma.cc/XA3F-L2R2.  Should a dispute arise between an investor from one party and the government of another, the ECT provides that parties give their "unconditional consent to the submission of a dispute to international arbitration," and it identifies various fora that an investor can select.  ECT art. 26(3)-(4).  For example, such arbitration can be submitted to the International Centre for Settlement of Investment Disputes (ICSID), established pursuant to the Convention on the Settlement of Investment Disputes Between States and Nationals of Other States, https://perma.cc/79CR-PJFE (ICSID Convention), or to an ad hoc tribunal established under the arbitration rules of the United Nations Commission on International Trade Law (UNCITRAL).  ECT art. 26(4). The ECT allows "any party to the dispute" to request that the arbitration be

held in a country that is a party to the Convention on the Recognition and

Enforcement of Arbitral Awards, https://perma.cc/NZ69-JV2T (New York

Convention).  ECT art. 26(5)(b).

**3.**  The United States is a party to the ICSID Convention, "a

multilateral convention designed to promote international investment" by

providing a "reliable process for the resolution of disputes between private

investors and governments." *Valores Mundiales, S.L. v. Bolivarian*

*Republic of Venezuela*, 87 F.4th 510, 513, 514 (D.C. Cir. 2023).  As relevant

here, the ICSID Convention provides:

> Each Contracting State shall recognize an award rendered
> pursuant to this Convention as binding and enforce the pecuniary
> obligations imposed by that award within its territories as if it
> were a final judgment of a court in that State.  A Contracting
> State with a federal constitution may enforce such an award in or
> through its federal courts and may provide that such courts shall
> treat the award as if it were a final judgment of the courts of a
> constituent state.

ICSID Convention, art. 54(1).  Congress implemented this requirement

through 22 U.S.C. § 1650a, under which "[f]ederal courts must give ICSID

awards 'the same full faith and credit as if the award were a final judgment of

a court of general jurisdiction of one of the several States.'" *Valores*

*Mundiales*, 87 F.4th at 516 (quoting 22 U.S.C. § 1650a(a)).  The ICSID

Convention entered into force for the United States on October 14, 1966.

**4.**  The United States is also a party to the New York Convention, a multilateral treaty that establishes a regime for the enforcement of international and foreign arbitration awards.  In relevant part, the New York Convention provides that "[e]ach Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon."  New York Convention art. III.  Congress enacted implementing legislation in Chapter 2 of the Federal Arbitration Act, 9 U.S.C. §§ 201-208.  The Convention entered into force for the United States on December 29, 1970.  Luxembourg, Spain, and the Netherlands are also parties to both the ICSID Convention and the New York Convention.

## B.  Factual Background and Prior Proceedings

These cases arise out of disputes between investors from the Netherlands and Luxembourg, on the one hand, and Spain, on the other, related to incentives Spain had offered to encourage investment in renewable energy projects in its territory.  Contending that Spain had violated its commitments under the ECT, the investors requested arbitration, some under ICSID rules and one under UNCITRAL rules.  All of the arbitral

6

tribunals issued awards in favor of the investors. *See NextEra* JA805-06;

*9REN* JA424; *Blasket* JA835-36.

Each investor petitioned the district court to confirm its award,

invoking the court's subject-matter jurisdiction under the FSIA's arbitration

exception; some also relied on the waiver exception. Spain moved to dismiss,

arguing (among other things) that sovereign immunity barred the actions

because there was no valid arbitration agreement between it and the

investors. Spain cited decisions from the Court of Justice of the European

Union holding that, as a matter of EU law, EU member states could not

lawfully enter into arbitration agreements that would allow arbitral tribunals

to resolve disputes between one member state and an investor from another.

The investors argued that the district court could not consider the issue

because the arbitral tribunals had concluded that a valid arbitration

agreement did exist. They further asked the district court to enjoin Spain

from pursuing ongoing legal actions in Dutch and Luxembourgish courts that

sought to enjoin their efforts to confirm the arbitral awards here. *See*

*NextEra* JA806-07; *9REN* JA424-25; *Blasket* JA838, 852 n.9.[1]

---

[1] During the pendency of district court proceedings, the investors in *Blasket* transferred their interest in their arbitral award to a Delaware firm.

7

The district court reached divergent conclusions in the cases. In *NextEra* and *9REN*, decided by Judge Chutkan, the court denied the motions to dismiss, concluding that "[t]he assertion that a party lacked a legal basis to enter or invoke an arbitration agreement" was not relevant to the "jurisdictional fact of that agreement's existence." *NextEra* JA815-16; *9REN* JA 432. The court also issued preliminary injunctions barring Spain from seeking any relief in the ongoing European actions that would interfere with the petitions to confirm the arbitral awards. *NextEra* JA832; *9REN* JA446. In *Blasket*, decided by Judge Leon, the court granted the motion to dismiss, agreeing with Spain that no arbitration agreement existed and that, as a result, the waiver and arbitration exceptions to FSIA did not apply. *Blasket* JA 849, 852. The court denied the request for injunctive relief as moot. *Blasket* JA 852 n.9.

## ARGUMENT

## I. A Federal Court Must Determine that an Arbitration Agreement Exists Before Exercising Jurisdiction Under the Arbitration Exception to the FSIA

The FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989). "Under the Act, a foreign

state is presumptively immune," and "unless a specified exception applies, a
federal court lacks subject-matter jurisdiction over a claim against a foreign
state." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993).  Thus, "[a]t the
threshold of every action" against a foreign state, a district court "must
satisfy itself that one of the exceptions applies."  *Verlinden B.V. v. Central
Bank of Nigeria*, 461 U.S. 480, 493-94 (1983).

The arbitration exception applies in any case brought "to confirm an
award" made pursuant to an "agreement to arbitrate" "made by the foreign
state with or for the benefit of a private party" if the award "is or may be
governed by a treaty or other international agreement in force for the United
States calling for the recognition and enforcement of arbitral awards."
28 U.S.C. § 1605(a)(6).  Thus, "the existence of an arbitration agreement, an
arbitration award and a treaty governing the award are all jurisdictional
facts that must be established."  *LLC SPC Stileks v. Republic of Moldova*,
985 F.3d 871, 877 (D.C. Cir. 2021).[2]

---

[2] This Court has applied a burden-shifting framework under which the
plaintiff bears an initial "burden of production" to support its claim that the
FSIA exception applies, but the ultimate "burden of persuasion rests with
the foreign sovereign claiming immunity, which must establish the absence of
the factual basis by a preponderance of the evidence."  *Chevron Corp. v.
Republic of Ecuador*, 795 F.3d 200, 204 (D.C. Cir. 2015).  This view appears

A series of this Court's recent decisions make clear that the district

court must make its own determination that an arbitration agreement exists.

The first is *Belize Social Development Ltd. v. Government of Belize*, 794

F.3d 99 (D.C. Cir. 2015), which involved a petition to enforce an arbitral

award arising out of the alleged breach of an "Accommodation Agreement"

between Belize and a private telecommunications company. *Id.* at 100-01.

Belize argued that the FSIA's arbitration exception did not apply because

the former Prime Minister lacked authority to execute the Accommodation

Agreement, which was therefore "void *ab initio*." *Id.* at 102. This Court

explained that, "[i]n order to succeed in its claim that there was no

'agreement made by the foreign state . . . to submit to arbitration'" as

required by the FSIA, "Belize must show that the Prime Minister lacked

---

to have been derived from the FSIA's legislative history, which mistakenly
described sovereign immunity as an affirmative defense that must be
established by the defendant. *See* H.R. Rep. No. 94-1487, at 17. But the
Supreme Court has emphasized that, under the text of the FSIA, "a foreign
state is presumptively immune from the jurisdiction of United States courts."
*Nelson*, 507 U.S. at 355. Even if "the foreign state does not enter an
appearance to assert an immunity defense, a District Court still must
determine that immunity is unavailable under the Act." *Verlinden*, 461 U.S.
at 493 n.20. There is therefore no justification for placing the ultimate
"burden of persuasion" on the foreign state. For present purposes, however,
it does not matter where the ultimate evidentiary burden lies. The relevant
point is that the district court must determine that the necessary
jurisdictional requirements are satisfied.

authority to enter into the arbitration agreement" contained within the overarching Accommodation Agreement. *Id.* (omission in original). The Court determined that Belize failed to make this showing, but it underscored that Belize would have "carr[ied] its burden of establishing that [the petitioner's] allegations do not bring this case within the FSIA's arbitration exception" had it established "that the Prime Minister lacked authority to enter the *agreement to arbitrate*." *Id.* at 103.

The second case is *Chevron Corp. v. Republic of Ecuador*, 795 F.3d 200 (D.C. Cir. 2015). In that case, "Ecuador argue[d] that the District Court failed to determine in the first instance that an arbitration agreement existed, instead deferring to the judgment of the arbitrator." *Id.* at 204. This Court agreed that "[t]he jurisdictional task before the District Court was to determine whether" the parties had "an agreement to arbitrate" and that its failure to mak[e] this determination as part of its jurisdictional analysis . . . was error." *Id.* at 205 & n.3. The FSIA "requires the District Court to satisfy itself" that there existed "an agreement between the parties" to engage in arbitration. *Id.* at 205 n.3. Ecuador did not ultimately prevail, however, because the specific challenge it presented—that its "offer to arbitrate" did not "encompas[s]" the "breach of contract claims" brought

11

by the petitioner—was a question about the scope of the arbitration agreement rather than its existence, and such scope-related questions lay beyond the jurisdictional inquiry. *Id.* at 205.

The third, and most recent, case is *Micula v. Government of Romania*, 805 F. App'x 1 (D.C. Cir. 2020) (per curiam). In that case, Swedish investors initiated arbitration before an ICSID tribunal pursuant to a bilateral investment treaty between Romania and Sweden. When they subsequently petitioned the district court to confirm their arbitral award, Romania argued—like Spain does here—that "the arbitration exception does not confer jurisdiction 'because the arbitration clause in the Sweden-Romania [treaty] has been declared invalid'" under EU law. *Micula v. Government of Romania*, 404 F. Supp. 3d 265, 277 (D.D.C. 2019). The district court analyzed the EU judicial decision invoked by Romania and, based on its independent analysis, concluded that the European court ruling did not preclude "jurisdiction under the FSIA's arbitration exception." *Id.* at 279.

This Court affirmed. On appeal, Romania agreed that the arbitration exception applied, but the European Commission, as *amicus curiae*, urged that the "agreement to arbitrate was nullified by [Romania's] ascension to the [EU]." *Micula*, 805 F. App'x at 1. This Court rejected the argument,

12

pointing to the district court's "carefu[l]" analysis. *Id.*  Notably, the Court declined to consider the Commission's other arguments on the ground that they were "non-jurisdictional" in nature. *Id.* at 1 n.1.

Together, these cases establish that when a foreign state contests application of the FSIA's arbitration exception by arguing that no arbitration agreement exists between that state and the party seeking to confirm an arbitral award, the district court must engage in an independent review of that objection before exercising jurisdiction over the petition to confirm. *See also Al-Qarqani v. Saudi Arabian Oil Co.*, 19 F.4th 794, 802 (5th Cir. 2021) (dismissing an enforcement petition for lack of jurisdiction because "there exists no agreement among these parties to arbitrate").  If the contested issue implicates factual questions, the court should consider affording respectful consideration to the findings made by the arbitral tribunal. *Cf. Solvay Pharm., Inc. v. Duramed Pharm., Inc.*, 442 F.3d 471, 477 (6th Cir. 2006) (noting that a court's independent consideration may be "informed by the arbitrator's resolution of the arbitrability question").  But the court ultimately must make an independent determination of whether an agreement to arbitrate exists and cannot treat the arbitrator's decision on the question as dispositive. *See Chevron*, 795 F.3d at 204 ("If there is no

13

arbitration agreement . . . , the District Court lacks jurisdiction over the foreign state and the action must be dismissed.").

The district court in *NextEra* and *9REN* mistakenly believed that this Court's decision in *Stileks* counseled a different approach. The parties in *Stileks* did not contest whether they had formed an agreement to arbitrate but instead disagreed on whether they had "agreed to arbitrate this *particular* dispute." 985 F.3d at 878. Adhering to the line drawn in *Chevron*, the Court held that "the arbitrability of a dispute is not a jurisdictional question under the FSIA." *Id.* But it underscored that "the existence of an arbitration agreement" *is* a "jurisdictional fac[t] that must be established." *Id.* at 877.

This approach is consistent with "the established ongoing duty of a court to determine its own jurisdiction." *Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 699 (D.C. Cir. 2022). Because "federal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction," *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011), a court must satisfy itself of the facts necessary to establish its jurisdiction and cannot simply rely on the conclusions of an arbitral panel.

14

*Cf. id.* (noting courts' obligation to "raise and decide jurisdictional questions that the parties either overlook or elect not to press").

It is also consistent with general principles that govern arbitration. "[T]he first principle that underscores all of [the Supreme Court's] arbitration decisions" is that "[a]rbitration is strictly 'a matter of consent.'" *Granite Rock Co. v. International Bhd. of Teamsters*, 561 U.S. 287, 299 (2010) (quoting *Volt Info. Scis., Inc. v Board of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989)).  Thus, a court cannot order arbitration of a dispute or enforce the award of an arbitration already conducted unless "the court is satisfied that neither the formation of the parties' arbitration agreement nor (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue." *Id.* (emphasis omitted); 1 Gary B. Born, *International Commercial Arbitration* 782 (3d ed. 2021) ("It is elementary that an international arbitration agreement cannot be recognized or enforced unless it has been validly formed.").  If either of these issues is disputed, "'the court' must resolve the disagreement." *Granite Rock*, 561 U.S. at 300; *see also BG Grp. PLC v. Republic of Argentina*, 572 U.S. 25, 34 (2014) (discussing the presumption that "courts, not arbitrators," must decide

15

"questions such as 'whether the parties are bound by a given arbitration clause'").

As the Supreme Court noted in *Granite Rock*, 561 U.S. at 299, parties can delegate questions regarding the validity or enforceability of an agreement to an arbitrator. But even when they do so, there must still be an antecedent determination made that the parties have actually formed an agreement to arbitrate. And that particular "threshold question" is "necessarily for 'the court to determine'—such that it cannot be delegated to an arbitrator." *Dist. No. 1, Pac. Coast Dist., Marine Eng'rs' Beneficial Ass'n v. Liberty Mar. Corp.*, 998 F.3d 449, 457 (D.C. Cir. 2021) (alterations omitted) (quoting *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019)); *see Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1030 n.7 (9th Cir. 2022) (explaining that "contract formation is always an issue for the court, notwithstanding the presence of a delegation clause").

Finally, this Court's approach to determining jurisdiction under the FSIA is consistent with the New York Convention, the ICSID Convention, and the domestic laws implementing them. It is only once a court is satisfied that the FSIA's jurisdictional requirements are met that the court can proceed to the recognition and enforcement procedures provided in those

16

treaties. That certain arbitrability questions—including those going to the validity or enforceability of an arbitration agreement—may be grounds to refuse to recognize or enforce an arbitral award under the New York Convention, *see* New York Convention art. V(1)(a), does not change the plain language of the FSIA and its threshold requirement that the parties have formed an arbitration agreement. *See Chevron*, 795 F.3d at 205 & n.3 (holding, in the context of a petition to confirm under the New York Convention, that the FSIA's jurisdictional analysis requires a determination that an arbitration agreement exists); *cf. Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 n.1 (2006) ("The issue of the contract's validity is different from the issue whether any agreement between the alleged obligor and obligee was ever concluded."); *K.F.C. v. Snap Inc.*, 29 F.4th 835, 837-38 (7th Cir. 2022) (distinguishing between void and voidable contracts).

Similarly, the district court's threshold jurisdictional inquiry in an action seeking to enforce an arbitral award under the ICSID Convention is not altered by the fact that, under that Convention, substantive review of the award is only available through limited avenues within the ICSID system and not in United States courts. ICSID Convention arts. 53(1), 54(1); *see Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96,

17

102, 118 (2d Cir. 2017) (explaining that member states' courts are "not permitted to examine an ICSID award's merits, its compliance with international law, or the ICSID tribunal's jurisdiction to render the award"). A district court is still required to determine its own jurisdiction under the FSIA. And doing so does not constitute improper review of the merits of the arbitral award itself. *See Micula*, 404 F. Supp. 3d at 275-76 (acknowledging the court's "limited" role in enforcing an ICSID award but nonetheless recognizing that it must "satisfy itself that one of the [FSIA] exceptions applies" (quoting *Verlinden*, 461 U.S. at 4994)). Nor does it run afoul of federal law implementing the ICSID Convention, which requires federal courts to give ICSID awards "the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States." 22 U.S.C. § 1650a(a). A party bringing an action against a foreign state in federal district court to enforce a judgment entered by a state court would likewise need to establish that one of the FSIA's exceptions would apply, so requiring that showing in a suit to enforce an ICSID award is fully consistent with Section 1650a(a). *See Mobil Cerro Negro*, 863 F.3d at 115 (explaining that Section 1650a(a) "does not constitute an independent grant of subject matter jurisdiction over a foreign sovereign").

18

## II.     A Foreign State Does Not Waive Sovereign Immunity Merely by Becoming a Party to the ICSID Convention or New York Convention

The waiver provision of the FSIA establishes that a foreign sovereign may waive its immunity from the jurisdiction of United States courts "either explicitly or by implication."  28 U.S.C. § 1605(a)(1).  "The FSIA does not specifically define what will constitute a waiver 'by implication,'" but this Court construes the term "narrowly."  *Khochinsky v. Republic of Poland*, 1 F.4th 1, 8 (D.C. Cir. 2021).  Specifically, this Court's cases require evidence "that the foreign state have intended to waive its sovereign immunity." *Broidy Capital Mgmt. LLC v. Muzin*, 61 F.4th 984, 995 (D.C. Cir. 2023).  The Court has emphasized that "[t]he 'requisite evidence of a foreign state's intent' to establish waiver by implication has been found in 'only three circumstances: (i) the state's "executing a contract containing a choice-of-law clause designating the laws of the United States as applicable"; (ii) the state's "filing a responsive pleading without asserting sovereign immunity"; or (iii) the state's "agreeing to submit a dispute to arbitration in the United States."'"  *Id.*  The Court has repeatedly expressed reluctance to "stray beyond these examples."  *Id.* (quoting *Khochinsky*, 1 F.4th at 9); *see also*

*Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1174 (D.C. Cir. 1994)

(noting that this reluctance dates to the FSIA' enactment).

Becoming a party to either the New York Convention or the ICSID

Convention, without more, does not provide the necessary "strong evidence"

that a foreign state intended to waive its sovereign immunity in United

States courts. *Khochinsky*, 1 F.4th at 8. These conventions establish

frameworks for arbitrating disputes and enforcing arbitral awards that may

result. But the conventions by themselves do not commit a foreign state to

engage in arbitration and therefore they could not implicitly waive sovereign

immunity for any enforcement action. *See* ICSID Convention pmbl.

(declaring that "no Contracting State shall by the mere fact of its ratification,

acceptance or approval of this Convention and without its consent be deemed

to be under any obligation to submit any particular dispute to conciliation or

arbitration"). Rather, as explained above, a foreign state can be subject to

arbitration only when it consents to an arbitration agreement. *Id.* art. 25(1)

(limiting ICSID jurisdiction to disputes that the parties "consent in writing

to submit to the Centre"). That is why the district court in each of these

cases recognized that "a specific arbitration agreement remains a

jurisdictional prerequisite" when a party attempts to invoke the waiver

20

exception to enforce an arbitral award.  *Next Era* JA810 n.1; *Blasket* JA850-52.

Its reasoning is consistent with this Court's case law.  In *Creighton Ltd. v. Government of State of Qatar*, the Court cited with approval the Second Circuit's conclusion that a party to the New York Convention had impliedly waived its sovereign immunity, but this Court did so only after noting that the foreign government in that case "had agreed . . . to arbitrate." 181 F.3d 118, 123 (D.C. Cir. 1999) (discussing *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co. v. Navimpex Centrala Navala*, 989 F.2d 572 (2d Cir. 1993)); *see Process & Indus. Devs. Ltd. v. Federal Republic of Nigeria*, 27 F.4th 771, 774 (D.C. Cir. 2022) (noting that this discussion was "dicta").[3]  Similarly, in *Tatneft v. Ukraine*, 771 F. App'x 9, 9-10 (D.C. Cir. 2019) (per curiam), the Court concluded that "the waiver exception applies if the foreign sovereign is a party to the New York Convention *and* has agreed to arbitrate in a Convention state," *Process & Indus. Devs.*, 27 F.4th at 774 (emphasis added) (describing *Tatneft*).

---

[3] The Second Circuit's more recent cases applying the waiver exception also involved circumstances where the foreign sovereign had agreed to arbitration.  *See Mobil Cerro Negro*, 863 F.3d at 104-05, 113; *Blue Ridge Invs., L.L.C. v. Republic of Argentina*, 735 F.3d 72, 83-85 (2d Cir. 2013).

21

While it is clear that an agreement to arbitrate would be a necessary condition before finding an implicit waiver in an action to enforce an arbitral award pursuant to the New York Convention or ICSID Convention, it is far from clear that the waiver exception could apply at all in such actions. Rather, in cases involving attempts to enforce arbitral awards against foreign states under the New York Convention or ICSID Convention, courts should rely on the FSIA's specific arbitration exception rather than the more general waiver exception.  *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("[I]t is a commonplace of statutory construction that the specific governs the general.").

The plain text of the arbitration exception indicates that it was intended to displace the waiver exception, at least for arbitration agreements and arbitral awards involving disputes between private parties and sovereign states.  Subparagraphs (A) through (C) of the arbitration exception identify specific scenarios in which jurisdiction exists over a petition to confirm an arbitral award—for example, where the arbitration takes place in the United States, or where the award is governed by the New York Convention or ICSID Convention.  28 U.S.C. § 1605(a)(6)(A)-(C).  Subparagraph (D) then provides for jurisdiction over enforcement petitions if "paragraph (1) of this

22

subsection"—meaning the waiver exception—"is *otherwise* applicable." *Id.*
§ 1605(a)(6)(D) (emphasis added).  The use of the word "otherwise" reflects
Congress's intent that, at a minimum, application of waiver principles in
arbitration cases should not be based on conditions described in
subparagraphs (A) through (C).  *See Otherwise*, Black's Law Dictionary
(11th ed. 2019) (defining otherwise to mean "[i]n a different way; in another
manner," "[b]y other causes or means," "[i]n other conditions or
circumstances," or "[e]xcept for what has just been mentioned").

   Canons of statutory interpretation point in the same direction.  If the
waiver exception were available to support jurisdiction in arbitration cases,
subparagraph (D) would be entirely superfluous.  A party that could
establish an express or implied waiver of sovereign immunity, such that
subparagraph (D) is satisfied, would necessarily also satisfy the waiver
exception.  The only reason why a party seeking to enforce an arbitral award
would seek to invoke the waiver exception (and not subparagraph (D) of the
arbitration exception) would be to avoid the threshold requirements of the
arbitration exception (including, for example, that the arbitration agreement
be made "with or for the benefit of a private party," 28 U.S.C. § 1605(a)(6)).
Statutory interpretation principles—including the canon against superfluity

and the specific controls the general—counsel against this result.  *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001); *Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 228-29 (1957).

Finally, as this Court has recognized, applying the waiver exception based solely on being a party to the New York Convention or ICSID Convention "may have implications for the treatment of the United States in foreign courts and for our relations with foreign states."  *Process & Indus. Devs.*, 27 F.4th at 775 n.3.  For example, the United States is regularly sued in foreign courts—"[a]t any given time, foreign lawyers under [the Office of Foreign Litigation's] direct supervision represent the United States in approximately 1,800 lawsuits pending in the courts of over 100 countries."  *See* Dep't of Justice, *Office of Foreign Litigation*, https://go.usa.gov/xtB5C (last updated Mar. 22, 2023).  Although United States courts have historically exercised restraint in construing implied waivers, other countries may not do so, especially if they perceive the United States as changing course.

Ultimately, however, it is unnecessary to "wade into the[se] murky waters."  *Process & Indus. Devs.*, 27 F.4th at 775 n.3.  The existence of an agreement to arbitrate is a necessary prerequisite under both the wavier and arbitration exceptions and would suffice on the facts of this case to establish

24

jurisdiction under the latter.  The Court therefore need not address whether

the waiver exception could ever provide jurisdiction to enforce an arbitral

award, even if a district court finds that the parties had an agreement to

arbitrate.

## III.   No Injunction Against Spain Is Justified Here

The district court's injunctions in *NextEra* and *9REN* were a

significant affront to a foreign state in contravention of principles of

international comity.  Enjoining a foreign sovereign from bringing suit in a

foreign court is an extraordinary remedy that would rarely (and possibly

never) be justified.  It is not justified here, where any interests of the United

States in preserving the jurisdiction of the district court are far outweighed

by the interests in allowing the foreign litigation to proceed.

Even attempting to control indirectly the activities of a foreign court

would represent a considerable affront to foreign sovereignty that should be

done sparingly.  *See* Restatement (Fourth) of the Foreign Relations Law of

the United States § 425 & Reporters' note 3 (Am. Law Inst. 2018)

(recognizing that an anti-suit injunction against "persons" is an "exceptional"

and "[e]xtraordinary" remedy").  This Court has cautioned that injunctions

preventing *private entities* from pursuing litigation in foreign courts are

25

available "only in the most compelling circumstances." *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 927 (D.C. Cir. 1984). "The equitable circumstances surrounding each request for an injunction must be carefully examined to determine whether . . . the injunction is required to prevent an irreparable miscarriage of justice." *Id.*; *see id.* at 916 (confirming that the anti-suit injunction was "clearly authorize[d]" by "principles of comity" before affirming).

But the injunctions here go even further, attempting to restrain directly *a foreign sovereign itself* from pursuing specific legal remedies in foreign courts. Where an injunction seeks to control the conduct of a foreign sovereign outside of the United States, "comity concerns are near their peak." *BAE Sys. Tech. Sol. & Servs., Inc. v. Republic of Korea's Def. Acquisition Program*, 884 F.3d 463, 480 (4th Cir. 2018) (affirming denial of anti-suit injunction against foreign government). Subjecting a foreign state to an anti-suit injunction that purports to control its conduct outside of the United States runs afoul of the basic principle of "the perfect equality of nations," from which flows the corollary principle that "no one can rightfully impose a rule on another." *The Antelope*, 23 U.S. (10 Wheat.) 66, 122 (1825).

This latter feature of the district court's injunctions is especially problematic and finds no support in either this Court's precedent or the FSIA's text.[4]

The district court reasoned that anti-suit injunctions were justified by the need to protect its jurisdiction to enforce NextEra's and 9REN's arbitral awards. *NextEra* JA820; *9REN* JA436-37. While such a concern could support an injunction against private parties, *see, e.g.*, *Laker Airways*, 731 F.2d at 927-31, it fails to account fully for all of the circumstances and interests when relief is sought against a foreign sovereign. Indeed, one significant characteristic often invoked by circuit courts approving anti-suit injunctions against private parties is the absence of direct effect on, or protest by, a foreign sovereign. *See id.* at 943, 944 (noting that "this is not a suit against a government, but a private action against a private corporation" and that "the British Government is not involved in this litigation"); *see also, E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 994 (9th Cir. 2006) ("There is no indication that the government of Ecuador is involved in the litigation."); *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 627 (5th Cir. 1996)

---

[4] The FSIA's legislative history indicates that injunctive relief against foreign states should only be permissible "when circumstances [a]re clearly appropriate," H.R. Rep. No. 94-1487, at 22 (1976). There is no indication Congress would have viewed this type of extraordinary relief as appropriate, much less clearly so.

("[N]o public international issue is implicated by the case: Achilles is a private party engaged in a contractual dispute with another private party."); *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, 10 F.3d 425, 428 (7th Cir. 1993) (noting that enjoining "an arm of the French state . . . from litigating a suit on a French insurance policy in a French court may seem an extraordinary breach of international comity" but finding that the government was in fact only a "passive investor" in what was practically no different from "an entirely private French company").

Nor were the requested injunctions "required to prevent an irreparable miscarriage of justice." *Laker Airways*, 731 F.2d at 927. The litigation pursued by Spain in the home countries of the award creditors involves complex questions of treaty interpretation—under a treaty to which the United States is not a party—and the application of EU law to member states and their citizens. The submission of the EU explains that these questions are of extraordinary importance to that body because they "implicat[e] the structure of the EU legal order, the role and jurisdiction of EU courts, the interpretation of EU law by non-EU adjudicatory bodies, and the future of the Energy Charter Treaty and investor-State arbitration within the EU." *Amicus* Br. European Commission on Behalf of the EU at

28

26, No. 23-7031. It would not deny due process to the award creditors or otherwise offend principles of justice for courts within the EU to decide such matters.

For much the same reasons, the district court's injunctions "violat[e] the crucial principles of comity that regulate and moderate the social and economic intercourse between independent nations." *Laker Airways*, 731 F.2d at 937. Spain, the Netherlands, and the European Commission have all registered their objections to the requested injunctive relief with this Court. *See Amicus* Br. Gov't of the Kingdom of the Netherlands at 4-16, No. 23-7031; *Amicus* Br. European Commission at 27-31, No. 23-7031; *NextEra* Appellant Br. at 54-59, Nos. 23-7031, 23-7032. The European Commission has separately communicated through diplomatic channels that the district court's injunctions present serious comity concerns by interfering with the resolution of complex questions of EU law within the EU legal system governing the enforcement of intra-EU arbitral awards. And Spain has similarly communicated its comity concerns to the State Department.

Finally, the imposition of injunctive relief has the potential to cause significant harm to the United States. The laws in many foreign nations do not even permit a court to enter an injunction against a foreign state, and

29

many foreign states will expect the United States to extend them the same respect and courtesy.[5]  If United States courts fail to do so, this could disrupt our relations with any country involved.  *Cf. Republic of Mexico v. Hoffman*, 324 U.S. 30, 35-36 (1945) (recognizing that actions affecting foreign state property can cause international disputes).  Moreover, as noted above, the United States is subject to many suits in foreign courts.  Because "some foreign states" account for principles of "reciprocity" in their treatment of other sovereign litigants, *Persinger v. Islamic Republic of Iran*, 729 F.2d 835, 841 (D.C. Cir. 1984), there is a real risk that issuance of an antisuit injunction in cases like this could prompt reciprocal injunctions against the United States.

---

[5] *See* Hazel Fox, *International Law and Restraints on the Exercise of Jurisdiction by National Courts of States*, in *International Law* 357, 364, 366, 371 (Malcolm D. Evans ed., 2003); *see also, e.g.*, State Immunity Act, R.S.C. 1985, c S-18 § 11 (Can.) (a state shall be immune from "an injunction, specific performance or the recovery of land or other property" except in certain terrorism cases); State Immunity Act 1978, c. 33, § 13(2)-(4) (Gr. Brit.) (foreign state may not be subject to any "injunction or order for specific performance," absent narrow circumstances not present here); State Immunity Act, c. 313 § 15(2)-(4) (2014 Rev. Ed.) (Sing.) (similar); Foreign State Immunities Act 87 of 1981 § 14 (S. Afr.) (similar).

30

Respectfully submitted,

RICHARD C. VISEK
   *Principal Deputy Legal Adviser*

   *U.S. Department of State*

BRIAN M. BOYNTON
   *Principal Deputy Assistant*
    *Attorney General*

SHARON SWINGLE

 */s/ Thomas Pulham*
THOMAS PULHAM
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7323*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 514-4332*
   *thomas.pulham@usdoj.gov*

February 2024

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,481 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in CenturyExpd BT 14-point font, a proportionally spaced typeface.

*/s/ Thomas Pulham*
Thomas Pulham