Nos. 23-7031, 23-7032

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

NEXTERA ENERGY GLOBAL HOLDINGS B.V., ET AL.,
*Petitioners - Appellees,*

v.

KINGDOM OF SPAIN,
*Respondent - Appellant.*

9REN HOLDING S.À.R.L.,
*Plaintiff - Appellee,*

v.

KINGDOM OF SPAIN,
*Defendant - Appellant.*

On Appeal from the United States District Court for the District of
Columbia, Case Nos. 1:19-cv-01618-TSC & 1:19-cv-01871-TSC,
Hon. Tanya S. Chutkan, *United States District Judge*

## BRIEF *AMICUS CURIAE* OF THE CHAMBER OF COMMERCE
## OF THE UNITED STATES OF AMERICA,
## IN SUPPORT OF APPELLEES AND AFFIRMANCE

PETER B. RUTLEDGE
*Counsel of Record*
215 Morton Avenue
Athens, GA 30605
(706) 542-7140
borutledge70@gmail.com

*Counsel for Amicus Curiae*

July 6, 2023

## CERTIFICATE AS TO PARTIES,
## RULINGS AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), *amicus curiae*, the Chamber of Commerce of the United States of America ("Chamber"), submits this certificate as to parties, rulings and related cases.

### A. Parties and *Amici*

Pursuant to Fed. R. App. P. 26.1 and Cir. R. 26.1, the Chamber discloses that it is a non-profit, tax-exempt organization incorporated in the District of Columbia.  The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber.

In No. 23-7031, the Kingdom of Spain was respondent in the district court and is appellant in this Court.  NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. were petitioners in the district court and are appellees in this Court.  The European Commission, on behalf of the European Union, appeared as *amicus curiae* in the district court.  Both the European Commission and the Government of the Kingdom of Netherlands appear as *amicus curiae* in this Court.

In No 23-7032, the Kingdom of Spain was defendant in the district court and is appellant in this Court.  9REN Holding S.À.R.L. was plaintiff

in the district court and is appellee in this Court. The European Commission, on behalf of the European Union, moved to appear as *amicus curiae* in the district court. The district court denied that motion without prejudice pending this appeal.

## B. Rulings under Review

References to the rulings under review appear in the Brief of Appellant, the Kingdom of Spain.

## C. Related Cases

Neither case has previously been before this Court. No. 23-7031 was previously before the district court as *NextEra Energy Global Holdings, B.V. et al. v. Kingdom of Spain*, No. 1:19-cv-01618. No. 23-7032 was previously before the district court as *9REN Holding S.À.R.L. v. Kingdom of Spain*, No. 1:19-cv-01871.

Based upon *amicus curiae*'s knowledge, Appellees' brief sets forth a complete list of pending cases presenting the same or similar issues and involving the Kingdom of Spain.

_____/s/_____

Peter B. Rutledge

ii

## STATEMENT REGARDING CONSENT TO FILE
## AND SEPARATE BRIEFING

All parties consent to the Chamber's participation as *amicus curiae*. Fed. R. App. P. 29; Cir. R. 29(b).

A separate *amicus brief* is appropriate in this case. While other *amici* address this appeal through the lens of an intra-European investment dispute, the statutory interpretation question at issue here has significant implications beyond that particular context, including for American companies. American companies routinely engage in cross-border commercial transactions with foreign sovereigns and sovereign-owned entities. Arbitration supplies an important, and frequently used, mechanism for resolving disputes arising out of those transactions. Consequently, the proper construction of the Foreign Sovereign Immunities Act's waiver and arbitration provisions matters greatly to the nation's business community. This brief offers the unique perspective of that community and explains the practical implications of the issues at stake in these appeals for American companies.

_____/s/_____

Peter B. Rutledge

iii

## STATEMENT OF AUTHORSHIP
## AND FINANCIAL CONTRIBUTIONS

No counsel for a party authored this brief in whole or in part, and

no person or entity other than *amicus curiae*, its members, or its

counsel contributed money that was intended to fund the preparation or

submission of this brief.  Fed. R. App. P. 29(a)(4)(E).

_____/s/_____

Peter B. Rutledge

iv

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS AND
  RELATED CASES................................................................................i

STATEMENT REGARDING CONSENT TO FILE AND
  SEPARATE BRIEFING ......................................................................iii

STATEMENT OF AUTHORSHIP AND
  FINANCIAL CONTRIBUTIONS........................................................iv

TABLE OF AUTHORITIES ......................................................................vii

STATUTES AND TREATIES ....................................................................1

IDENTITY, INTEREST AND SOURCE OF AUTHORITY .....................1

INTRODUCTORY STATEMENT ..............................................................5

SUMMARY OF ARGUMENT ..................................................................12

ARGUMENT ..............................................................................................14

I.  AFFORDING APPELLANT SOVEREIGN IMMUNITY
    WOULD FLOUT THE ICSID CONVENTION'S PRINCIPLE
    OF NON-INTERFERENCE, VIOLATE THE UNITED
    STATES' TREATY OBLIGATIONS AND OFFER A
    ROADMAP FOR FOREIGN SOVEREIGNS TO AVOID
    THEIR OWN OBLIGATIONS ........................................................15

    A.  Declaring Appellant Immune Undermines the Purpose of
        the ICSID Convention and its Non-Interference Principle.....16

# TABLE OF CONTENTS
(continued)

B. Affording Immunity Would Flout Appellant's and the United States' Clear Obligation Under International Law to Enforce ICSID Awards ........................................................... 20

C. Granting Immunity Charts a Path For Foreign Sovereigns to Avoid Their Own Legal Obligations .................................... 26

II. COMITY FAVORS THE EXERCISE OF JURISDICTION AND, IN ALL EVENTS, CANNOT ALTER STRAIGHTFORWARD APPLICATION OF THE FSIA ............... 30

CONCLUSION ........................................................................ 34

CERTIFICATE OF COMPLIANCE ......................................... 36

CERTIFICATE OF SERVICE................................................... 37

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Agudas Chasidei Chabad of U.S. v. Russian Federation*,
528 F.3d 934 (D.C. Cir. 2008) ................................................................. 14

*Belize Social Dev., Ltd. v. Government of Belize*,
794 F.3d 99 (D.C. Cir. 2015) ........................................................... 28, 29

*BG Group v. Republic of Argentina*,
572 U.S. 25 (2014) ...................................................... 7, 17, 19

*Blue Ridge Invs., LLC v. Argentina*,
735 F.3d 72 (2d Cir. 2013) ...................................................... 11

*Chevron Corp. v. Republic of Ecuador*,
795 F.3d 200 (D.C. Cir. 2015) ........................................................... 18, 19

*Cont'l Cas. Co. v Argentine Republic*,
893 F. Supp. 2d 747 (E.D. Va. 2012) ...................................................... 10

*Creighton v. Gov't of the State of Qatar*,
181 F.3d 118 (D.C. Cir. 1999) ............................................................. 12

*Crystallex Int'l Corp. v. Venezuela*,
244 F. Supp. 3d 100 (D.D.C. 2017) ...................................................... 7

*ESAB Grp., Inc. v. Zurich Ins. PLC*,
685 F.3d 376 (4th Cir. 2012) ................................................................. 26

*First Options of Chi., Inc. v. Kaplan*,
514 U.S. 938 (1995) ............................................................................ 19

vii

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Fujitsu Ltd. v. Fed. Express Co.*,
247 F.3d 423 (2d Cir. 2001)....................................................................21

*LLC SPC Stileks v. Republic of Moldova*,
985 F.3d 871 (D.C. Cir. 2021)..........................................................17, 19

*Maritime Int'l Nominees Establishment v. Republic of Guinea*,
693 F.2d 1094 (D.C. Cir. 1982) .............................................................6-7

*Micula v. Gov't of Romania*,
2022 WL 18356669 (D.D.C. Dec. 22, 2002) ....................................13, 32

*Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*,
863 F.3d 96 (2d Cir. 2017)..............................................................7-8, 16

*Mora v. New York*,
524 F.3d 183 (2d Cir. 2008)............................................................21, 24

*Republic of Argentina v. NML Capital, Ltd.*,
573 U.S. 134 (2014) ........................................................................14, 33

*Republic of Austria v. Altmann*,
541 U.S. 677 (2004) ...............................................................................33

*Republic of Mexico v. Hoffman*,
324 U.S. 30 (1945) ...................................................................................9

*Seetransport Wiking Trader Schiffahrtsgesellschaft mbH & Co. v.*
*Navimpex Centrala Navala*,
989 F. 2d 572 (2d Cir. 1993)..................................................................12

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Tethyan Copper Co. Pty Ltd. v. Islamic Republic of Pakistan*,
  590 F. Supp. 3d 262 (D.D.C. 2022) ...................................................... 11

*The Schooner Exchange v. M'Faddon*,
  7 Cranch 116 (1812) ........................................................................... 9

*Van Buren v. United States*,
  141 S. Ct. 1648 (2021) ................................................................. 12, 15

*Venezuela v. Helmerich & Payne Int'l*,
  581 U.S. 170 (2017) ............................................................................ 32

*Yates v. United States*,
  574 U. S. 528 (2015) .......................................................................... 15

**Statutes & Treaties**

22 U.S.C. § 1650a........................................................... 9, 20, 29, 33

28 U.S.C. § 1330.................................................................... 10, 14

28 U.S.C. § 1605(a)(1).......................................................... 10, 33

28 U.S.C. § 1605(a)(6)..................................................... 11, 12, 33

28 U.S.C. §§ 1609–11............................................................... 34

Energy Charter Treaty, Art. 42 ............................................... 22

Federal Arbitration Act (FAA), 9 U.S.C. §§ 1 *et seq.*........................ 19, 29

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Convention on the Settlement of Investment Disputes Between
States and Nationals of Other States, Mar. 18, 1965, 18 U.S.T.
1270 (ICSID Convention) ...... 6-9, 11-13, 15-18, 20, 23-25, 30-31, 33, 34

    Art. 52(1) ................................................................. 8

    Art. 54 ........................................................... 8, 16, 24

    Art. 55 .................................................................. 34

    Art. 64 .................................................................. 25

Convention on the Recognition and Enforcement of Foreign
Arbitral Awards, June 10, 1958, 330 U.N.T.S. 3 (New York
Convention) ............................................................ 7, 8, 12, 26

Vienna Convention on the Law of Treaties, May 23, 1969, 1155
U.N.T.S. 331 ........................................................... 21, 24

    Art. 26 .................................................................. 24

    Art. 27 .................................................................. 21

**Other Authorities**

132 Cong. Rec. 27999 (1986) .................................................... 4

Arbitral Awards:  Hearing Before the Subcomm. on Admin. L. and
Gov't Relations, 99th Cong. (May 20, 1986) ................................ 2-3, 11

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

D. Behn *et al.*, *Empirical Perspectives on Investment Arbitration: What Do We Know? Does It Matter?*, 21 J. World Investment & Trade 188 (2020) ........................................................ 25

A. Bjorklund, *Sovereign Immunity as a Barrier to the Enforcement of Investor-State Arbitral Awards: The Re-politicization of International Investment Disputes*, 21 AM. REV. INT'L ARB. 211 (2010) ................................................................................................. 4

Gary B. Born, International Commercial Arbitration (3d ed. 2020) ........ 2

Gary B. Born & Peter B. Rutledge, International Civil Litigation in United States Courts (7th ed. 2023) ............................................. 2, 11

Brief of the Chamber of Commerce of the United States of America *et al.* as *Amici Curiae* in Support of the Petitioners, *ZF Automotive US, Inc. v. Luxshare, Ltd.*, 142 S. Ct. 2078 (2022) .......... 1

Cir. R. 26.1 ................................................................................................... i

Cir. R. 28(a)(1) ............................................................................................ i

Cir. R. 29(b) ........................................................................................... iii, 5

Convention on the Settlement of Investment Disputes: Hearing on H.R. 15785 Before the Subcomm. on Int'l Orgs. and Movements of the Comm. on Foreign Affairs, 89th Cong. (1966) .................. 16-17

B. Cremades, *Disputes Arising Out of Foreign Direct Investment in Latin America: A New Look at the Calvo Doctrine and Other Jurisdictional Issues*, 59 DISP. RES. J. 78 (2004) ............................... 28

xi

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

I. Damjanovic & O. Quirico, *Intra-EU Investment Dispute Settlement Under the Energy Charter Treaty in light of* Achmea *and* Vattenfall: *A Matter of Priority*, 26 COLUM. J. EUR. L. 102 (2019)..................................................................................................22

*Denunciation of ICSID Convention*, INT'L CENTRE FOR SETTLEMENT INVS. DISP. (May 16, 2007), https://icsid.worldbank.org/news-and-events/news-releases/denunciation-icsid-convention ................23

Fed. R. App. P. 26.1 ....................................................................................i

Fed. R. App. P. 29 ....................................................................................iii

Fed. R. App. P. 29(a)(4)(E) ........................................................................iv

Fed. R. App. P. 29(b)................................................................................5

H.R. Rep. 94-1487 (1976) ........................................................................10

Index of Bilateral Investment Treaties, EXPORT.GOV, https://tcc.export.gov/Trade_Agreements/Bilateral_Investment_Treaties/index.asp................................................................................2

Index of Free Trade Treaties, OFFICE OF THE U.S. TRADE REPRESENTATIVE, https://ustr.gov/trade-agreements/free-trade-agreements..................................................................................................2

D. Moskvan, *The Clash of Intra-EU Bilateral Investment Treaties with EU Law: A Bitter Pill to Swallow*, 22 COLUM. J. EUR. L. 101 (2016)..................................................................................................23

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

Restatement (Fourth) of Foreign Relations Law (2018).........................21

Restatement (Third) U.S. Law of Int'l Comm. Arb. PFD (2019)..8, 18, 34

Lucy Reed *et al.*, Guide to ICSID Arbitration (2011).......................4, 7, 8

S. Rep. 94-1310 (1976).........................................................................10, 33

Schreuer's Commentary on the ICSID Convention, Stephan W.
    Schill (ed.), (3d ed. 2022)........................................................24, 25, 34

W. Shan, *Is Calvo Dead*, 55 AM. J. COMP. L. 123 (2007) .........................28

Tate Letter, 26 Dep't of State Bull. (1952) .................................................9

*The Trade Amendment (TA) of the Energy Charter Treaty (ECT)
    Explained to Decision-Makers of Ratifying Countries*, ENERGY
    CHARTER SECRETARIAT (2018), https://www.energycharter.org/
    fileadmin/DocumentsMedia/Thematic/Trade_Amendment_Exp
    lanations-EN.pdf ................................................................................22

U.S. Dep't of State, Treaties in Force (2020).........................................23

G. Verhoosel, *Uncanny:  Investment Arbitration's Three Tales of
    Trouble*, Am. Rev. Int'l Arb. 291 (2019)...........................................25

xiii

# GLOSSARY OF ABBREVIATIONS

ECT         Energy Charter Treaty

FAA         Federal Arbitration Act

FSIA        Foreign Sovereign Immunities Act

ICSID       International Centre for the Settlement of Investment Disputes

VCLT        Vienna Convention on the Law of Treaties

UNCITRAL    United Nations Commission on International Trade Law

**STATUTES AND TREATIES**

All applicable statutes and treaties are contained in an addendum to the Brief of Appellees.

**IDENTITY, INTEREST AND SOURCE OF AUTHORITY**

Identity:  The Chamber is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country.  An important function of the Chamber is to represent the interests of its members before Congress, the Executive Branch and the courts.  To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.  It has participated in numerous cases involving international arbitration.  *See, e.g.,* Brief of the Chamber of Commerce of the United States of America *et al.* as *Amici Curiae* in Support of the Petitioners, *ZF Automotive US, Inc. v. Luxshare, Ltd.*, 142 S. Ct. 2078 (2022).

Interest:  The Chamber has a significant interest in the issues presented by these appeals.  American businesses, whether directly or

1

through foreign affiliates, routinely engage in cross-border relations with foreign sovereigns and sovereign-owned entities.  Those relations may involve garden-variety commercial transactions or, as is the case here, foreign direct investment pursuant to bilateral or multilateral treaties. Nearly three-thousand such treaties are in force throughout the world. *See* I Gary B. Born, International Commercial Arbitration § 1.04[A] at 129 (3d ed. 2020).  The United States is a party to roughly forty of them along with approximately a dozen trade agreements containing investment provisions.  *See* Index of Bilateral Investment Treaties, EXPORT.GOV, https://tcc.export.gov/Trade_Agreements/Bilateral_Investm ent_Treaties/index.asp (last visited July 1, 2023); Index of Free Trade Treaties, OFFICE OF THE U.S. TRADE REPRESENTATIVE, https://ustr.gov/ trade-agreements/free-trade-agreements (last visited July 1, 2023).

In these "commercial dealing with foreign states," arbitration ensures "that there can be a neutral, objective means of resolving the parties' disputes."  Gary B. Born & Peter B. Rutledge, International Civil Litigation in United States Courts 381–82 (7th ed. 2023) (hereinafter "*Born & Rutledge*").  It represents a "key feature of [the United States'] bilateral investment treaty program."  Arbitral Awards:  Hearing Before the

2

Subcomm. on Admin. L. and Gov't Relations of the Comm. On the Judiciary, 99th Cong. 2d Sess. 32 (May 20, 1986) (hereinafter "*1986 House Hearing*") (written statement of Acting Legal Adviser, Dep't of State).

Not only does arbitration help to resolve disputes with foreign sovereigns when they arise, it represents an essential consideration at the time a commercial or investment relationship is consummated. "[E]nforceable arbitration agreements eliminate a major barrier to international investment and trade and thus promote U.S. private investment abroad and exports." 1986 House Hearing at 182 (written statement of Cecil J. Olmstead ). Arbitration reduces jurisdictional uncertainty, obviates the need for the American investor to seek relief against the foreign sovereign in that sovereign's own courts and enhances investor confidence about remedies. *Id.* An intricate web of multilateral treaties governing the enforcement of arbitral awards (far more effica-cious than comparable agreements governing foreign judgment enforcement) makes arbitration so central to foreign commerce and investment.

Robust award enforcement through these treaties is critical. "The effectiveness of international arbitration depends on the degree of

finality of the award and the ease with which the award may be enforced by the prevailing party."  Lucy Reed *et al.*, Guide to ICSID Arbitration 179 (2011) (hereinafter "*Reed*").    Efforts by foreign sovereigns to circumvent their treaty obligations threaten the integrity of that system and, consequently, the very conditions upon which foreign commerce and foreign direct investment depend.  *See* A. Bjorklund, *Sovereign Immunity as a Barrier to the Enforcement of Investor-State Arbitral Awards:  The Re-politicization of International Investment Disputes*, 21 AM. REV. INT'L ARB. 211, 223 (2010).  National courts help to hold foreign sovereigns accountable and to ensure that they do not welch on their commitments. As Senator Lugar explained, grants of subject-matter jurisdiction to enforce international arbitral awards against foreign sovereigns "allow U.S. courts to help Americans engaged in international business to have their fair day in court" and "reassures U.S. businesses that the international arbitration process will work."  132 CONG. REC. 27999 (1986).

Thus, while the particular facts of these appeals happen to involve European investors and European sovereigns, the underlying legal issues carry profound implications for this nation's business community and its future economic relations with foreign sovereigns around the world.  The

4

Chamber files this brief to address those implications lying at the intersection of the laws governing international arbitration and foreign sovereign immunity.

Source of Authority:  Federal Rule of Appellate Procedure 29(b) and this Circuit's Rule 29(b) supply the source of authority for filing this brief. All parties have consented to this filing.

## INTRODUCTORY STATEMENT

While these appeals seem to present a legal thicket, intertwining multiple treaties and federal laws, they reduce to a straightforward question:  Has Appellant carried its burden of proving that exceptions to the Foreign Sovereign Immunities Act ("FSIA") do not apply?  The answer is equally straightforward:  No.  To understand why, it helps to untangle two branches of that thicket:  the law governing international arbitration and the law governing foreign sovereign immunity.

International arbitration:  Generally, international arbitration between private companies and foreign sovereigns takes two forms, commercial arbitration and investment arbitration.  These appeals concern the latter form.  Investment arbitrations differ from commercial arbitrations in several important respects:

5

- *First*, the jurisdictional foundations can differ.  Whereas commercial arbitrations typically are grounded in a contractual agreement, investment arbitrations are grounded in a treaty, whether bilateral or, in these appeals, multilateral (*i.e.,* the Energy Charter Treaty ("ECT")).  In these treaties, signatory states agree with each other to arbitrate claims brought by investors of other signatory state(s).  The paradigmatic investment arbitration involves an investor from one signatory state commencing proceedings directly against another signatory state.

- *Second*, the legal regimes can differ.  Whereas commercial arbitrations routinely take place pursuant to laws and rules set forth in the parties' contractual agreements, investment arbitrations typically take place pursuant to standards set forth in the operative treaty and often involve the application of international-law principles.  For example, the arbitrations underlying these appeals all involve the Convention on the Settlement of Investment Disputes Between States and Nationals of Other States, Mar. 18, 1965, 18 U.S.T. 1270 ("ICSID Convention").  *See Maritime Int'l*

*Nominees Establishment v. Republic of Guinea*, 693 F.2d 1094, 1102–03 (D.C. Cir. 1982).

- *Third*, the enforcement regimes can differ. Commercial arbitrations often are subject to a treaty (like the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 330 U.N.T.S. 3 ("New York Convention") under which national courts apply a generally applicable set of defenses to enforcement petitions. By contrast, ICSID Convention arbitrations (like those at issue here) are subject to a specialized scheme specific to sovereigns that requires the award debtor to seek relief exclusively before an *ad hoc* annulment committee appointed by the Chair of ICSID's Administrative Council.[1] *See Mobil Cerro Negro,*

---

[1] ICSID arbitrations differ from closely related ones taking place pursuant to the ICSID additional facility rules or the United Nations Commission on International Trade Law ("UNCITRAL") Rules administered by ICSID. Those arbitrations often are governed by the New York Convention as implemented by the jurisdiction where they are issued or where their recognition and enforcement is sought. Reed at 181. *See, e.g., Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 244 F. Supp. 3d 100, 106–07 & n. 3 (D.D.C. 2017). This was the case in the Supreme Court's decision in *BG Group v. Republic of Argentina*, where the award creditor sought confirmation of an award from a BIT arbitration pursuant to the New York Convention. 572 U.S. 25, 31 (2014).

*Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96, 101 (2d Cir. 2017); Restatement (Third) U.S. Law of Int'l Comm. Arb. §5.5 PFD Reporters' Note b(ii) (2019) ("[A]n *ad hoc* committee, and an *ad hoc* committee alone, has authority to annul an ICSID Convention award."). That committee (a sort of appellate arbitral body) applies uniform international standards set forth in Article 52(1) the ICSID Convention. National courts play a very limited role in such proceedings; they do not apply a set of defenses but, instead, enforce the award automatically. *Compare* ICSID Convention Art. 54, *with* New York Convention Art. 5.

As one leading commentary explains:

> A strength of the ICSID Convention is that it is even more favorable to recognition and enforcement of awards than the New York Convention. The ICSID Convention accepts no grounds whatsoever for national courts to refuse recognition and enforcement of ICSID tribunal awards. It requires, instead, that national courts of Contracting States recognize and enforce monetary awards immediately, as if they were final judgments of the local courts themselves. Reed at 180–81.

In the United States, the ICSID implementing legislation discharges this obligation. It requires that "[t]he pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and

8

credit as if the award were a final judgment of a court of general jurisdiction of one of the several States." 22 U.S.C. § 1650a. Reflecting the distinctly "de-localized" quality of ICSID arbitrations, this implementing legislation also specifies that the Federal Arbitration Act "shall not apply to the enforcement of awards rendered pursuant to the [ICSID] convention." *Id.*

Foreign Sovereign Immunity: An award creditor (*i.e.*, the party prevailing in the arbitration), seeking to enforce an award against a foreign sovereign in the United States, proceeds under the FSIA. That is the other branch of this thicket.

From its earliest origins, the immunity of foreign sovereigns from the jurisdiction of United States courts always has been a matter of grace, not right. *The Schooner Exchange v. M'Faddon*, 7 Cranch 116, 136 (1812). In the decades immediately preceding the FSIA's enactment, that grace depended largely on suggestions of immunity by the Executive Branch. *See, e.g., Republic of Mexico v. Hoffman*, 324 U.S. 30 (1945). As set forth in the Tate Letter, 26 Dep't of State Bull. 984 (1952), those suggestions turned on the restrictive theory under which certain conduct could subject the sovereign to judicial jurisdiction.

This method of Executive Branch determinations produced problems.  As the FSIA's legislative history explains:  "From a foreign relations standpoint, the initiative is left to the foreign state," and "[f]rom the standpoint of the private litigant, considerable uncertainty results."  S. Rep. 94-1310 at 10 (1976) (hereinafter "*1976 S. Rep.*").

To reduce both this dependence on foreign state "initiative" and this "considerable uncertainty," the FSIA replaced the practice with a federal statute containing "firm standards" that courts could readily apply.  H.R. Rep. 94-1487 at 7 (1976) (hereinafter "*1976 House Rep.*"); 1976 S. Rep. at 10.  The FSIA authorized federal subject-matter jurisdiction over any claim with respect to which the foreign state is not entitled to an immunity set forth in Sections 1605–07 (or under any applicable international agreement).  28 U.S.C. § 1330.  Consistent with pre-FSIA practice, the original exceptions set forth in Section 1605 instances cases in which the foreign sovereign waived its immunity.  28 U.S.C. §1605(a)(1).  This waiver exception initially supplied the primary basis upon which courts examined their jurisdiction over actions to enforce arbitration awards.  *See generally Cont'l Cas. Co. v Argentine Republic*, 893 F. Supp. 2d 747, 751 & n. 10 (E.D. Va. 2012) (collecting cases).  A few courts "struggled"

10

to develop entirely predictable standards regarding the application of the FSIA's waiver exception.  *See generally* Born & Rutledge at 382.

To eliminate any uncertainty, Congress added the arbitration exception in 1988.  That exception expressly grants subject-matter jurisdiction over actions to enforce arbitral awards.  Since its enactment, courts routinely apply Section 1605(a)(6) to exercise jurisdiction over actions to enforce ICSID awards against foreign sovereigns.  *See Blue Ridge Invs., LLC v. Argentina*, 735 F.3d 72, 85 (2d Cir. 2013) (observing that "every court to consider whether awards issued pursuant to the ICSID Convention fall within the arbitral award exception to the FSIA has concluded that they do"); *Tethyan Copper Co. Pty Ltd. v. Islamic Republic of Pakistan*, 590 F. Supp. 3d 262 (D.D.C. 2022) (exercising FSIA jurisdiction and enforcing ICSID award).  This new arbitration exception did not displace the above-described jurisprudence developed under the waiver exception.  Rather, at the request of the State and Justice Departments, Section 1605(a)(6) specified that the waiver exception could still apply to actions to enforce arbitration awards.  1986 House Hearing at 32 (written statement of Acting Legal Adviser, Dep't of State); *id.* at 69 (written statement of Deputy Ass't Atty. Gen.).  Consequently,

11

even after Section 1605(a)(6)'s enactment, some circuits continue to apply the waiver exception to actions against foreign sovereigns to enforce arbitral awards falling under treaties. *See, e.g., Seetransport Wiking Trader Schiffahrtsgesellschaft mbH & Co. v. Navimpex Centrala Navala*, 989 F. 2d 572, 578 (2d Cir. 1993). *Compare Creighton v. Gov't of the State of Qatar*, 181 F.3d 118, 123 (D.C. Cir. 1999) (declining to apply waiver exception where Qatar had not signed New York Convention).

## SUMMARY OF ARGUMENT

Appellant has failed to carry its burden to prove that the waiver and arbitration exceptions to the FSIA do not apply. In addition to the arguments offered by Appellees, two additional reasons support that conclusion.

First, Appellant's proposed construction of the FSIA carries disastrous consequences for international investment (and commercial) arbitration. That "fallout underscores the implausibility of [Appellant's] interpretation." *Van Buren v. United States*, 141 S. Ct. 1648, 1661 (2021). Allowing Appellant to contest the ICSID tribunal's jurisdiction in a national court would completely undermine the treaty's architecture, which channels such determinations exclusive to the tribunal and,

12

thereafter, the *ad hoc* annulment committee.  Moreover, dismissing these cases (and consequently refusing to enforce the underlying awards) would violate Appellant's and the United States' obligations under the ICSID Convention.  Finally, crediting Appellant's argument would create a roadmap for foreign sovereign governments to concoct after-the-fact roadblocks to enforcement anytime they fail to prevail in an arbitration, whether investment or commercial.

Second, the comity arguments advanced by Appellant and its *amici* are specious.  Appellant and its *amici* argue that entertaining jurisdiction in this case would offend comity principles by embroiling the federal courts in an essentially intra-European dispute.  Far from it.  If comity bears at all here on the question of statutory interpretation before this Court, it *favors* the exercise of jurisdiction.  Failing to give effect to the United States' obligations under the ICSID treaty and ignoring the clear command of the ICSID implementing legislation would regularly drag federal courts into diplomatic thickets and "seemingly never-ending saga[s] over an international arbitration award [enforcement]."  *Micula v. Gov't of Romania*, 2022 WL 18356669 at *1 (D.D.C. Dec. 22, 2002).  In all events, comity arguments do not supply an off-ramp to application of

a clear Congressional command, especially under the FSIA where the entire purpose of the statute was to provide "firm standards" and "clear guidance" to federal courts and parties alike. *See, e.g., Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 146 (2014).

## ARGUMENT

The FSIA authorizes federal courts to exercise subject-matter jurisdiction and personal jurisdiction in cases against foreign sovereigns. 28 U.S.C. § 1330. Jurisdiction extends to "to any claim for relief *in personam* with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement." *Id.*

Under this Circuit's precedent, the burden of production lies initially with the party seeking to invoke an exception to the immunity. As there is no dispute that Appellees in both appeals have met that burden with respect to both the waiver and arbitration exceptions, the burden of persuasion then "rests with the foreign sovereign claiming immunity, which must establish the absence of [a] factual basis by a preponderance of the evidence." *Agudas Chasidei Chabad of U.S. v. Russian Federation*, 528 F.3d 934, 940 (D.C. Cir. 2008).

14

Appellees' Brief (at 28–54) already applies many tools to explain why Appellant has failed to carry that burden. While endorsing those arguments, this brief focuses on the practical consequences of Appellant's contrary position and explains why, in light of those consequences, this Court should reject its invocation of sovereign immunity.

## I. AFFORDING APPELLANT SOVEREIGN IMMUNITY WOULD FLOUT THE ICSID CONVENTION'S PRINCIPLE OF NON-INTERFERENCE, VIOLATE THE UNITED STATES' TREATY OBLIGATIONS AND OFFER A ROADMAP FOR FOREIGN SOVEREIGNS TO AVOID THEIR OWN OBLIGATIONS.

Finding Appellant immune from an ICSID enforcement action would carry disastrous consequences for international investment and commercial arbitration. That "fallout underscores the implausibility of [Appellant's] interpretation. It is 'extra icing on a cake already frosted.'" *Van Buren*, 141 S. Ct. at 1661 (quoting *Yates v. United States,* 574 U. S. 528, 557 (2015) (Kagan, J., dissenting)). Three consequences warrant close consideration.

15

### A.    Declaring Appellant Immune Undermines the Purpose of the ICSID Convention and its Non-Interference Principle.

Extending sovereign immunity here would rip a keystone from the foundation of international investment arbitration. That keystone, reflected in Article 54(1) of the ICSID Convention, is the non-interference of national courts in the jurisdictional determinations of ICSID tribunals. *See Mobil Cerro*, 863 F.3d at 102. ("Member states' courts are not permitted to examine an ICSID award's merits, its compliance with international law *or the ICSID tribunal's jurisdiction to render the award*; under the Convention's terms, they may do no more than examine the judgment's authenticity and enforce the obligations imposed by the award.") (emphasis added).

Recall that the ICSID Convention was designed to foster a "favorable investment climate" by increasing "the confidence on the part of investors . . . that disputes between investor and host government can be settled in an orderly and impartial manner." Convention on the Settlement of Investment Disputes: Hearing on H.R. 15785 Before the Subcomm. on Int'l Orgs. and Movements of the Comm. on Foreign

16

Affairs, 89th Cong. 2d Sess. (1966) (statement of Deputy Legal Adviser, Dep't of State). It operates in conjunction with treaties like the ECT which was designed "to encourage and protect cross-border investment in the energy industry." *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 874 (D.C. Cir. 2021).

To support that capital formation, the principle of non-interference serves several important purposes. At the investment stage, the principle of non-interference offers critical jurisdictional certainty about how an aggrieved investor will seek relief for injury to its investment. When disputes do arise, the principle of non-interference ensures that the award's substance, including disagreements about the tribunal's jurisdiction, remains exclusively the province of a neutral tribunal and any *ad hoc* committee convened pursuant to the ICSID Convention. Judicial non-interference also reflects the reality that "[i]nternational arbitrators are likely more familiar than are judges with the expectations of foreign investors and recipient nations regarding the operation of [a treaty] provision." *BG Group*, 572 U.S. at 40.

Against this principle of non-interference, Appellant's requested relief is jarring. Appellant invites federal courts, under the guise of a

17

jurisdictional determination, to re-examine the substance of the tribunal's (and the *ad hoc* committee's) prior conclusions. That contravenes the conditions under which investors (and their host states) agreed to the investment pursuant to the ICSID's guarantees. Consequently, "application of sovereign immunity to actions to enforce ICSID awards stands to undermine the ICSID Convention's very purposes, which include a commitment by ratifying States to enforce ICSID Convention awards." Restatement (Third) U.S. Law of Int'l Comm. Arb. § 5.6 PFD Reporters' Note (a)(iii). Thus, any immunity inquiry must respect this principle of non-interference and the underlying conditions against which parties made an investment.

Precedent supports this restraint. On two prior occasions, this Circuit has declined to allow a sovereign party to relitigate the merits of an arbitral tribunal's jurisdictional determination under the ruse of challenging the applicability of an exception under the FSIA. In *Chevron Corp. v. Republic of Ecuador*, this Circuit refused Ecuador's request to read the FSIA's arbitration exception to require *de novo* review of whether Chevron's claims in that case fell within the scope of the applicable bilateral investment treaty. 795 F.3d 200, 205–06 (D.C. Cir.

18

2015).  Later, in *Stileks* this Circuit took an even more definitive stance in the context of claims arising under the ECT and held that the court "must accept the arbitral tribunal's determination that [the investor's] claim fell within the ECT."  985 F.3d at 879.  Thus, *Chevron* and *Stileks* stand for the proposition that respect for the integrity of the international arbitral process precludes a sovereign party from trying to relitigate a tribunal's jurisdictional determination in the context of challenging subject-matter jurisdiction under Section 1605.

These appeals present an even easier case for application of that principle.  The arbitrations in both *Chevron* and *Stileks* took place under slightly different regimes than these appeals.  *Chevron* was an investment arbitration under in the UNCITRAL Arbitration Rules; *Stileks* also was an ECT arbitration under the UNCITRAL Arbitration Rules.  Those rules contain language clearly delegating jurisdictional determinations to the arbitral tribunal, *see BG Group*, 572 U.S. at 40, so, under jurisprudence developed under the Federal Arbitration Act ("FAA") (9 U.S.C. §§ 1 *et seq.*), federal courts must *defer* to those delegations to determine jurisdiction.  *See First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938 (1995).

19

ICSID arbitrations stand on a different footing.  As noted in the Introductory Statement, not only does the ICSID regime delegate jurisdictional determinations to the ICSID tribunal, it also both channels any challenges to those determinations exclusively to the *ad hoc* committees and affirmatively precludes interference by national courts in those determinations.  *See supra* at 7–9.  ICSID's implementing legislation, 22 U.S.C. §1650a, likewise precludes application of the Federal Arbitration Act and, consequently, displaces even the deferential review developed thereunder.  Thus, here, courts must not simply defer to but affirmatively *refrain from examining* those jurisdictional determinations.

## B.    Affording Immunity Would Flout Appellant's and the United States' Clear Obligation Under International Law to Enforce ICSID Awards.

All of the relevant sovereigns in these appeals (Spain, Netherlands and Luxembourg) remain signatory states to the ECT.  Likewise, all of the relevant sovereigns in these appeals (Spain, Netherlands, Luxembourg and the United States) remain parties to the ICSID Convention.  Nor have the *terms* of these conventions changed.

20

Nonetheless, Appellant (at 40–45) seeks to avoid its international law obligations by pointing to the decisions of the European Court of Justice and public declarations from a subset of Member States. That argument is wrong.

For one thing, the judicial decisions of a regional authority (just like the judicial decisions of another sovereign) cannot alter a state's obligations under international law. *See* Restatement (Fourth) of Foreign Relations Law § 302(3) (2018) (discussing the general rule that "[a] state may not invoke the violation of a provision of its domestic law as a basis for invalidating its consent to an international agreement"); Vienna Convention on the Law of Treaties (hereinafter "*VCLT*") Art. 27, May 23, 1969, 1155 U.N.T.S. 331 ("A party may not invoke the provisions of its internal law as justification for its failure to perform a treaty."); *Mora v. New York*, 524 F.3d 183, 196 n. 19 (2d Cir. 2008) (noting that "[t]he Department of State considers the [VCLT] an authoritative guide to current treaty law and practice"). To alter their international law obligations, states have a variety of options. *See Fujitsu Ltd. v. Fed. Express Co.*, 247 F.3d 423, 433 (2d Cir. 2001) ("The ongoing effect of treaties under customary international law is not governed by the same

21

rule governing the ongoing effect of statutes under the common law. Rather, customary international law, as recited by the Vienna Convention in some detail, supplies its own distinct set of rules concerning the amendment, modification, suspension, and termination of international agreement."). Options include:

(1) **Amend the treaty** (as drafters of the ECT did pursuant to Article 42 with a trade amendment in 2010, see *The Trade Amendment (TA) of the Energy Charter Treaty (ECT) Explained to Decision-Makers of Ratifying Countries*, ENERGY CHARTER SECRETARIAT (2018), https://www.energycharter.org/fileadmin/Doc umentsMedia/Thematic/Trade_Amendment_Explanations-EN.pdf);

(2) **Include a disconnection clause** which "would have excluded the applicability of the ECT in intra-EU situations with respect to ECT provisions which fall within the scope of EU law, without affecting the EU or Member States' obligations towards third parties," an option proposed but rejected for the ECT. I. Damjanovic & O. Quirico, *Intra-EU Investment Dispute Settlement Under the Energy Charter Treaty in light of* Achmea *and* Vattenfall: *A Matter of Priority*, 26 COLUM. J. EUR. L. 102, 117 (2019)); or

(3) **Denounce the treaty** (as a few signatory states to ICSID have done, see *Denunciation of ICSID Convention*, INT'L CENTRE FOR SETTLEMENT INVS. DISP. (May 16, 2007), https://icsid.worldbank. org/news-and-events/news-releases/denunciation-icsid-convention).

Appellant has taken none of those steps (which would only have prospective effect).

If mere European judicial interventions were to supply a basis for member states to flout their treaty obligations, it would seriously damage the legal architecture underpinning U.S.-European economic relations well beyond this context. *See* D. Moskvan, *The Clash of Intra-EU Bilateral Investment Treaties with EU Law: A Bitter Pill to Swallow*, 22 COLUM. J. EUR. L. 101, 138 (2016) (footnote omitted) ("Any threat to the legal certainty of direct investment bears huge political and economic risks."). The United States and European member states are parties to several bilateral treaties. *See* U.S. Dep't of State, Treaties in Force 53, 135, 381 (2020) (referencing investment agreements with Bulgaria, Estonia and Romania). Under Appellant's view, any intervening decision of the European Commission (such as a conclusion regarding illegal state aid) or the European Court of Justice might be invoked to thwart relief

under those treaty obligations. American companies could no longer rely on the international law obligations of European member states when engaging in commercial relations.

Even if Appellant disregards *its* obligation under the ICSID Convention to honor the awards, the United States has an independent obligation to enforce them. Under Article 54 of the ICSID Convention, each contracting State (including the United States) must "recognize an award rendered pursuant to [the ICSID] Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State." Settled principles of international law make plain this treaty like "[e]very treaty in force is binding upon the parties to it and must be performed by them in good faith." VCLT Art. 26; *see also Mora*, 524 F.3d at 196 n. 19. Appellant's behavior does not alter this independent obligation to give "automatic recognition" to ICSID awards. II Schreuer's Commentary on the ICSID Convention, Stephan W. Schill (ed.), 1473 (3d ed. 2022) (hereinafter "*Schreuer*").

Declining to do so would constitute a distinct violation of international law. As the leading commentator on the ICSID Convention

24

has recognized, "[f]ailure of a State party to the Convention to recognize and enforce an award would be a breach of a treaty obligation." II Schreuer at 1479. In this context, others have recognized that any state would violate its obligations under the ICSID Convention if it were to refuse enforcement on the basis of EU law. *See* G. Verhoosel, *Uncanny: Investment Arbitration's Three Tales of Trouble*, Am. Rev. Int'l Arb. 291, 299-300 (2019).

The ramifications could be severe. At a minimum, this could subject to the United States to proceedings before the International Court of Justice for failure to fulfill its treaty obligation. ICSID Convention Art. 64; II Schreuer at 1479–80, 1679–80. Moreover, other ICSID signatory states might retaliate by refusing to enforce ICSID awards secured by American investors in investment arbitrations against other sovereign governments. According to one recent study, American companies were the most common claimants in investment arbitrations. *See* D. Behn *et al.*, *Empirical Perspectives on Investment Arbitration: What Do We Know? Does It Matter?*, 21 J. World Investment & Trade 188, 192, 194 (2020). The risk to American companies would be especially pronounced in the context of other investment (and commercial awards) falling under

25

the New York Convention. *See supra* at 8 & n. 1. Under that convention, signatory states can deposit reciprocity reservations, linking their willingness to enforce awards with the degree to which the United States does so. *Cf. ESAB Grp., Inc. v. Zurich Ins. PLC*, 685 F.3d 376, 395–96 (4th Cir. 2012) (Wilkinson, J., concurring) (noting that interpreting federal statutes in a manner that might conflict with the United States' treaty obligations might "invite retaliation" when an American company seeks to rely on that same treaty elsewhere).

## C.    Granting Immunity Charts a Path For Foreign Sovereigns to Avoid Their Own Legal Obligations.

Finally, expansive applications of immunity would create a roadmap for foreign sovereigns to welch on their arbitration obligations. Consider what is happening here: After recruiting investors to make significant investments in its energy industry according to an agreed-upon set of terms (including dispute resolution terms) set forth in an international treaty, Appellant altered those terms and seeks to justify that course-change based upon a supervening conclusion by a European court that it never had the authority to enter into those relationships.

26

This argument has no logical stopping point. Any sovereign could enter into an investment (or commercial) arrangement with an American investor, promising to arbitrate future disputes as an inducement toward that investment. Then, following an unfavorable award by an arbitral tribunal, the sovereign simply could take some official action to invalidate that obligation or to claim that it (or its agent) lacked the authority to assume it. If that were the law, no American business could ever undertake with confidence an investment (or commercial) relationship with a foreign sovereign. This contradicts not only general principles of international law, but also Congress's specific intent behind adoption of the arbitration exception – precisely to stamp out after-the-fact efforts by foreign sovereigns on the losing end of an arbitration to construct barriers to effective enforcement of the arbitral awards. *See supra* at 12–13.

History substantiates these concerns. In the nineteenth and the first half of the twentieth centuries, some developing nations pushed an anti-investment jurisprudence known as the Calvo doctrine. That doctrine rested on two premises (1) that foreign investors were not entitled to different protections than their domestic counterparts and (2) foreign investors' remedies exclusively were limited to those available in

27

national courts. *See* W. Shan, *Is Calvo Dead*, 55 Am. J. Comp. L. 123, 124–27 (2007).   The Calvo doctrine undermined minimum international standards of investor protection and weakened investor confidence in the integrity of the dispute resolution mechanism as a keystone of foreign commercial relations.  It damaged developing countries' economies and, indeed, contributed to the development of bilateral and multilateral investment treaties in the post-World War II Era, including among the very nations that had previously articulated (and been harmed by) the Calvo doctrine.   B. Cremades, *Disputes Arising Out of Foreign Direct Investment in Latin America:  A New Look at the Calvo Doctrine and Other Jurisdictional Issues*, 59 Disp. Res. J. 78, 80–81 (2004).  Not unlike a modern-day version of the Calvo doctrine, Appellant's position would undermine the procedural guarantees underlying foreign investment and, thereby, damage the conditions upon which foreign economic relations depend.

This Circuit has refused to indulge similar tactics.  *See Belize Social Dev., Ltd. v. Government of Belize*, 794 F.3d 99 (D.C. Cir. 2015).  *Belize Social Development* involved an effort to enforce an arbitral award against a foreign sovereign.  Resisting jurisdiction, the foreign sovereign

employed an argument similar to Appellant – arguing that the FSIA's arbitration exception did not apply because the award was rendered pursuant to a void agreement. The alleged defect in the agreement was that former Prime Minister of Belize lacked the authority to enter into the agreement (a conclusion reached after the new Prime Minister renounced the agreement). This Court unanimously rejected Belize's argument and exercised jurisdiction under the arbitration exception, holding that any defect in the Prime Minister's capacity did not affect the arbitration agreement.

Appellant (at 34–38) seeks to avoid the force of *Belize Social Development* by arguing that this case involves a frontal attack on the offer to arbitrate itself (as opposed to the analogous substantive commitments contained in the ECT). It draws upon American jurisprudence allocating authority between courts and tribunals to determine challenges to the arbitration agreement, including questions whether the agreement was ever formed. That argument is incorrect. As noted above, *supra* at 9, Congress expressly has excluded application of the FAA to actions to enforce ICSID awards. 22 U.S.C. § 1650a. So it makes no sense to draw on principles developed under the FAA to inform

29

determinations about the allocation of decisional authority. The better reading is that the ICSID Convention is insulated from such sovereign posturing by delegating jurisdictional questions exclusively to the tribunal and the *ad hoc* committee. Thus, foreign sovereigns cannot avoid FSIA jurisdiction by making after-the-fact capacity or validity arguments inconsistent with the applicable rules that govern the allocation of authority to make that determination.

## II.    COMITY FAVORS THE EXERCISE OF JURISDICTION AND, IN ALL EVENTS, CANNOT ALTER STRAIGHT-FORWARD APPLICATION OF THE FSIA.

Fallout aside, Appellant and its *amici* advance a host of comity arguments in an effort to justify judicial restraint here. Appellant (at 57) argues that "cardinal principles of comity require that domestic courts not take action that may cause the violation of another nation's laws." *Amicus* the European Commission (at 10, 24–27) invokes comity to require deference to the European Court of Justice's decision interpreting the relationship between the ECT and European law. *Amicus* the Kingdom of Netherlands (at 6–7) describes comity as a "degree of deference to the acts of a foreign nation in a nation's domestic realm" and

urges "circumspection" when adjudication involves the conduct of America's foreign relations.

While the three briefs' competing comity conceptions illustrate its malleability, they all fail for a few common reasons. For one thing, they get the comity analysis backwards. While comity might sometimes entail deference to foreign sovereign acts taken in their territory, it does not license a foreign sovereign to violate its obligations under international law or to invite the United States to be complicit in such violations. Doing so would turn the entire ICSID regime on its head because, as explained above, foreign investment and commerce depend critically on a necessary degree of confidence in the mechanisms established under international law for resolving disputes. *See supra* at 2–4. Comity arguments are especially dissonant when framed as a request to litigate an ICSID award in national courts when the foundational purpose of ICSID was to eliminate the interference of those very courts. If accepted, these comity arguments risk turning any proceeding to enforce an award against a foreign sovereign into a fact-dependent examination of the foreign relations implications; it would regularly drag federal courts into diplomatic thickets and "seemingly never-ending saga[s] over an … award

31

[enforcement]." *Micula*, 2022 WL 18356669 at *1. In short, Appellant's approach "would create increased complexity in respect to a jurisdictional matter where clarity is particularly important." *Venezuela v. Helmerich & Payne Int'l*, 581 U.S. 170, 183 (2017).

The European Commission (at 27–31) points to the risk that enforcing these awards might constitute illegal European state aid. Of course, *enforcing* the award does not result in the payment of any aid but simply reduces the award to a judgment. Moreover, parties, including sovereigns, confront conflicting obligations all the time. Examples include an order to enforce an arbitral award that has been vacated in the sovereign's own courts or a discovery order that conflicts with the sovereign's own privacy laws. Comity mediates conflicts over which a party has no control. It does not excuse the sovereign's own choices, here its voluntary obligations under European law and its voluntary obligations under various treaties to which Appellant remains a party.

In all events, comity cannot derail a jurisdictional inquiry under the FSIA. Recall that a principal purpose of the FSIA was "to transfer the determination of sovereign immunity from the executive branch to the judicial branch, *thereby reducing the foreign policy implications of*

*immunity determinations and assuring litigants that these often crucial decisions are made on purely **legal** grounds . . . .").* 1976 S. Rep at 9 (emphasis added). Consequently, since the FSIA's enactment, the Supreme Court has repeatedly rejected appeals to comity to influence its construction. *See, e.g., NML Capital*, 573 U.S. at 146; *Republic of Austria v. Altmann*, 541 U.S. 677, 699 (2004). As *Altmann* explained, the FSIA's principle purposes included "clarifying the rules that judges should apply in resolving sovereign immunity claims and eliminating political participation in the resolution of such claims." *Id*. Those purposes are especially weighty in actions to enforce ICSID awards where not only does the FSIA provide multiple bases upon which to exercise jurisdiction, 28 U.S.C. §1605(a)(1) & (6), but Congress has instructed federal courts to treat those awards like pecuniary judgments, 22 U.S.C. § 1650a. Thus, Appellant's and its *amici*'s "apprehensions are better directed to that branch of government with authority to amend the [FSIA] – which, as it happens, is the same branch that forced [the Judiciary's] retirement from the immunity-by-factor-balancing business . . . ." *NML Capital*, 573 U.S. at 146.

33

Exercising jurisdiction to enforce these awards does not leave foreign sovereigns defenseless in United States courts. They can attempt to invoke the immunity of sovereign-owned property from execution. *See* 28 U.S.C. §§ 1609–11. *See generally* Restatement (Third) U.S. Law of Int'l Comm. Arb. §5.5 PFD Reporters' Note (b)(iii) (2019); *id.* § 5.6 Reporters' Note (a)(iii). While the ICSID Convention obligates signatory states (like the United States) to *enforce* an ICSID award, Article 55 "leaves the law on State immunity from execution intact." II Schreuer at 1520. This balanced approach – ensuring enforcement of an ICSID award while preserving a degree of immunity from execution – illustrates how the FSIA already reflects comity principles in its very design; there is no need for further resort to those principles to twist the meaning of Section 1605(a)'s mandate.

## CONCLUSION

In sum, these appeals concern preserving the integrity of investment arbitration, ensuring that the United States does not violate its international law obligations, maintaining the fidelity to Congress' commands, and avoiding the ensuing chaos if the FSIA were misconstrued so as to permit an internal European rule to preclude

34

jurisdiction over an action to enforce an arbitral award.  For the foregoing

reasons, in addition to those set forth in Appellees' brief, this Court

should affirm the judgments of the district court.

Respectfully submitted,

PETER B. RUTLEDGE
 *Counsel of Record*
215 Morton Avenue
Athens, GA 30605
(706) 542-7140
borutledge70@gmail.com

*Counsel for Amicus Curiae*

July 6, 2023

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32-1 because:

   ☒ this brief contains 6,357 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), or

   ☐ this brief uses a monospaced typeface and contains ____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   ☒ this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook, *or*

   ☐ this brief has been prepared in a monospaced spaced typeface using *(state name and version of word processing program)* _____ with *(state number of characters per inch and name of type style)* _____

s/ Peter B. Rutledge
Peter B. Rutledge

36

## CERTIFICATE OF SERVICE

I hereby certify that, on July 6, 2023, an electronic copy of the foregoing Brief Amicus Curiae of the Chamber of Commerce of the United States of America, in Support of Appellees and Affirmance was filed with the Clerk of Court using the ECF system and thereby served upon all counsel appearing in this case.

July 6, 2023                              /s Peter B. Rutledge
                                          Peter B. Rutledge